## SUPREME COURT.

### MINOTT MITCHELL agt. MILES COOK and others.

Where more than one person are the absolute owners of a bank and the securities upon which it is organized and established under the general act to authorize the business of banking, (*Laws of* 1838, *ch.* 260, *p.* 245,) it is a fraud upon the state, to institute the proceedings and enter the securities for the bank in any name as an *individual banker.* Where, however, it appears that such ownership as to all except one individual, consists simply in and does not extend beyond the profits and plates of the bank, the bank is properly chartered to the individual who has the absolute ownership of the securities, and entered in any name as an individual banker.

The *comptroller cannot* upon receiving from a third person, circulating notes to the amount of a bond and mortgage, for which they were given, transfer it to him either directly or indirectly. (*Mitchell* agt. *Cook,* 3 *Seld.* 538.) But such third person may, under a previous agreement with the owner to purchase the bond and mortgage, and on such consideration paid to the comptroller, perfect his title thereto, by an assignment to him from the owner or owners, after a re-assignment thereof by the comptroller to the latter.

Where a mortgagor actually pays money to an officer of a bank, who has an interest in but not an owner of its capital, with an intent that it should be credited to him on his bond and mortgage, which he knows, or has good reason to know, is at the time held by the comptroller, as security for the circulating notes of the bank, such payment is unauthorized, and it cannot avail the mortgagor, unless the payee of the money on behalf of the bank should pay the amount to the comptroller; because no part of the principal moneys of a bond and mortgage can be legally paid to another while they are held by the comptroller. The mortgagor must rely in such case upon the responsibility of the individual to whom he pays the money. A subsequent *bona fide* purchaser for good consideration of such bond and mortgage of the real owner and ignorant of such payment, will be protected to the full amount thereof.

*Westchester Special Term, October,* 1858.

THIS is an action to foreclose a mortgage given by the defendants Cook and wife, to Elisha Crawford, and eventually assigned by him, and also by the White Plains Bank, of which he had been president, to the plaintiff.

S. E. LYONS *and* WM. SILLIMAN, *for plaintiff.*
J. M. VAN COTT, *for defendants.*

S. B. Strong, Justice.   The mortgage was dated on the 4th of September, 1844, and given to secure the payment of fourteen hundred dollars in seven years from its date, with interest at the rate of six per cent. payable semi annually, according to a bond from Cook to Crawford, of the same date.   Crawford was or is alleged to have been at the time an individual banker, transacting business in the name or under the designation of the "White Plains Bank."   Crawford testified on his last examination, that the bank was instituted by him as an individual banker, under the general act to authorize the business of banking.   (*Laws of* 1838, *chap.* 260, *p.* 245.)   This is confirmed by the entries in the books kept in the office of the superintendent of the state bank department.   The ledger opening an account with the bank, is headed in the following words:  "Dr. White Plains Bank, stocks, individual bank owned by Elisha Crawford of White Plains, Cr."   There is also an affidavit on file in that office, made by Crawford, on the 25th of July, 1849, stating that the bank was an individual bank, and that no person was interested with him directly or indirectly in the securities deposited with the comptroller. The loan to Cook was negotiated by one Richard Cadmus, who was at the time cashier, and who now asserts that he was the owner of the bank.   His allegation that he was the owner, is to some extent confirmed by the testimony of George Crawford and William H. Seely ; from which it would seem that Cadmus, George Crawford and Seely, had originally owned each one-third of the bank, and that Crawford and Seely, had transferred their interest to Cadmus.   Seely, however, testified that such ownership consisted simply in, and did not extend beyond the profits and plates.   If they were the absolute owners, they were associated bankers, and they should have been described as such in the books of the bank department.   But there is no evidence that any entry to that effect was made in the books.   It would not be right to infer, except from clear evidence, that all of these parties had perpetrated a fraud upon the state for the purpose of obtaining facilities as an individual banker, to which they would not have been entitled as an as-

sociation.   Cadmus, when asked whether he owned the mort-
gages which were in the hands of, and deposited with the
comptroller, did not answer the question directly, but said, " I
considered them to be under my control at any moment."
There is no formal conveyance by Cadmus to any one of the
bank or of any of the securities belonging to it, previous to
July, 1846, when he became, as he states, a bankrupt.   He
then made an assignment of his property for the benefit of his
creditors, in terms sufficiently broad to have covered his in-
terest in the bank, if he had any.   But, although one of his
assignees was examined as a witness in behalf of the defend-
ants, it does not appear that the assignees ever claimed any
interest in the bank, or any of its securities, or that they inter-
fered in any way in its management.   Besides, when Cook
on a subsequent day, made a tender of what he alleged to be
due on the mortgage, he made such tender to Elisha Crawford,
and not to Cadmus or his assignees.   There is no evidence that
Cook at the time consulted with Cadmus, but it may I think,
be reasonably inferred that he did, as they had previously
transacted much of the business together, and appear from the
evident leaning shown in the testimony of Cadmus, to be on
friendly terms.   The plain inference from all the reliable evi-
dence is, that although when the loan to Cook was made, Cad-
mus had an interest in the affairs of the bank, yet it did not
extend to its capital, or the securities taken in its behalf and
assigned to the state comptroller.   The bond and mortgage
given by Cook was obtained for the purpose of depositing them
in the comptroller's office, and receiving the amount in circu-
lating notes intended for the bank.   Examinations as to the
value of the property for the satisfaction of the comptroller
were made with so much publicity that Cook must have been
aware of the object in making the loan.   On the 5th of Sep-
tember, 1844, the mortgagee assigned the bond and mortgage
to the comptroller, " to secure the redemption of the circula-
ting notes of the White Plains Bank."   On the 20th of the
same month, Cook, who had in the meantime received the
amount for which his securities had been given in the circu-

Mitchell agt. Cook.

lating notes of the bank, signed an admission that he was indebted to Elisha Crawford in the sum of 1,400 dollars, secured by the said bond and mortgage, and that he had received notice that such bond and mortgage had been assigned by E. Crawford to the comptroller of the state. Subsequently Crawford, (and when I speak of a person bearing that name without any other designation, I mean the mortgagee,) signed a paper dated on the 21st of January, 1844, but mistaken in the year, as that must have been in 1845, authorizing Cadmus to collect the interest on several bonds and mortgages, and among others the bond and mortgage from Cook. Cadmus swears that he also had written authorities from Crawford to collect and receive the principal, but in this he is directly contradicted by Crawford, as one paper only is produced, and that simply authorizes the collection of the interest, and no satisfactory reason is given for the non-production of the supposed documents if they ever existed, and especially as an alleged authority to receive the principal due or to become due on securities assigned to the comptroller, would be wholly nugatory, and no reason is shown why there should be any expectation that the principal moneys secured by Cook's mortgage would be paid before they became payable by the terms of the securities, (in 1851;) the inference is strong that no authority was given by Crawford to Cadmus, to receive the principal moneys loaned to Cook.

On the 1st of January, 1846, Cook paid to Cadmus, and took his receipt for 1,000 dollars of the principal, and all the interest due on the entire principal moneys secured by the said bond and mortgage. It has been said already that no authority has been shown, nor can any be inferred from the proof, from Crawford to Cadmus to receive such principal. His employment as cashier of the bank did not confer such authority. Besides, if he received the money as a reduction to that extent of the principal, it was a fraud upon the state, or it would have been if he could have effectuated that purpose. He knew that the comptroller could not receive payment of a part of the principal, nor would it seem that he intended to pay it to that

officer, as he made no attempt to do so, but as he confessed, had mingled the money with his own funds.

As to Cook, he knew that his bond and mortgage had been assigned to the comptroller to secure the payment of the circulating notes of the bank, and as those papers were not produced by Cadmus at the time, he had strong reason to suppose, if he did not actually know, that they were still held by the comptroller for the purpose for which they had been assigned to him. If, under these circumstances, he intended that his payment should operate as a present reduction of the principal he was a participator in the fraud. It is a characteristic of fraud that it cannot avail the perpetrator, and if the usual effect could be fortified, it would be in this instance by the consideration that the act was manifestly against public policy. The payment could not operate as an absolute reduction of the principal. If the state had been under the necessity of selling the securities, the sale would have conferred a title to the entire principal. A reconveyance to the assignor would have the same effect, unless he had participated in the fraud. In this case, the assignor had neither received nor sanctioned the receipt of the principal. It is clear that Crawford was not consulted about the payment, and that he knew nothing about it until long after it had been made. Cadmus swears that he thinks that he communicated it to Crawford before he took a re-assignment from the comptroller, but Crawford swears positively that he heard nothing about it until after he had transferred the securities to the plaintiff, and in this he is supported by what took place when it was mentioned to him by his brother, and subsequently or the same day, when Cook and his counsel, Mr. C. P. Smith, called to make the tender to which I have alluded. The witnesses do not entirely agree as to what occurred at the last-mentioned interview. Mr. Smith says, that Crawford said he knew or had heard of the payment; he did not recollect that Crawford remarked, " I have just heard of it," although he may have said so. But George Crawford and Borst, (a witness introduced by the defendant,) both testified that E. Crawford said

Mitchell agt. Cook.

that he had just heard of it from his brother. The testimony of Cadmus, that he thought, but did not know, that he had made a previous communication of the payment to Crawford, is outweighed by the positive denial of the latter, and the circumstances sustaining such denial narrated by the other witnesses. Shortly previous to the 18th of July, 1846, the plaintiff delivered to Crawford circulating notes of the White Plains Bank, amounting to 1,400 dollars, on an agreement between them, that Crawford should pay them to the comptroller, and take from him a re-assignment of Cook's bond and mortgage for the benefit of the plaintiff. On the day last particularized, Crawford delivered the same notes to the comptroller, and received from him a re-assignment of the bond and mortgage, bearing date on the same day. Within a few days afterwards, Crawford delivered those securities to the plaintiff, but did not then execute any formal assignment of them. The plaintiff thereupon instituted a suit against Cook and wife, to foreclose the mortgage. They defended the suit, and the action was tried before Judge McCoun, at a special term. The evidence before him was much the same as that which has been adduced in this case, except that there is now evidence from the bank department that Crawford was an individual banker, which was not adduced before, and there have been since some additional acts confirmatory of the plaintiff's title. Judge McCoun rendered a judgment in favor of the plaintiff, directing a foreclosure of the mortgage for the entire principal and the interest thereon, from the time when the plaintiff acquired a title to or interest in the securities. This judgment was unanimously affirmed at a general term by the same learned judge and Judges Barculo and Morse. Their judgment was reversed by the court of appeals, solely on the grounds that the comptroller could not convey the bond and mortgage to any other than the person who had assigned it to him, either directly or indirectly, and there had been no transfer to the plaintiff after the re assignment to him. The court of appeals could not have decided, and of course did not decide, that Crawford could not subsequently assign the securities to the plain-

tiff for a consideration previously advanced by him. The judgment of this court at special term and at general term, remain unaffected except as to the points mentioned in the decision of the court of appeals to which I have alluded. It forms a respectable if not a controlling authority in favor of the conclusions which I have thus far indicated, and which must have been substantially adopted by Judges McCoun, Barculo and Morse.

After the judgment of the court of appeals had been rendered, and in the month of April, 1853, Crawford executed an assignment of the bond and mortgage in question to the plaintiff. Crawford had previously on the 16th of December, 1849, conveyed the bank to one Emory B. Pottle, of Naples, in the county of Ontario. Pottle on the 2d of March, 1851, transferred the bank to Seth C. Hart of the same place, and the White Plains Bank, by Hart as its president, on the 6th of July, 1853, assigned all its interest in the bond and mortgage from Cook to the plaintiff. On the 22d of July, 1846, Cook tendered 400 dollars and the interest upon that to Crawford, in full satisfaction of the bond and mortgage, which Crawford refused to receive.

In my narrative of the facts, I have so far considered the questions of law that it is not necessary for me to do much more than state my conclusions.

The judgment of the court of appeals cannot operate as an estoppel to the plaintiff in this suit, as he has since perfected his right so as to avoid the objections which then operated against him. He has since received an assignment from the mortgagee and also from the bank. Neither the bank nor the mortgagee oppose his claim. It is clear that the plaintiff has now the sole title to the mortgage, if anything remains due upon it.

The main question is, whether the mortgage is still an incumbrance upon the land, and if so to what extent? If the payment of one thousand dollars to Cadmus was at the time or subsequently became effective as a reduction of the debt, and there was afterwards a valid tender of the residue, then the

Mitchell agt. Cook.

land is entirely released from the lien, and the plaintiff must fail in this action, although he would still have a claim for such residue against Cook on the bond. Did then the payment of one thousand dollars to Cadmus, operate at the time or afterwards as a reduction of the principal secured by the bond and mortgage? As I have already mentioned, it could not reduce such principal while the securities were in the comptroller's office. Neither could it have such effect at any time, if Cadmus neither had any title to the securities, nor any legitimate authority to receive such principal, or any part of it. If I am right in inferring that Cadmus had neither such title or authority, then the payment was inoperative, except possibly to create a personal claim against him. But if, as the counsel for the defendants contended on the trial, Cadmus owned the bank, and the security was taken nominally for Crawford but actually for him, and the money had been paid to and accepted by Cadmus, on a promise or understanding that it should be credited upon the bond and mortgage when he should again become entitled to and have them, could Cook now claim a credit for the amount, and a proportionate reduction of the principal?

Neither Cook nor Cadmus, nor the bank whoever owned it, nor Crawford as a trustee for any one, could claim these securities from the comptroller without the actual payment of the principal to him. The money received from Cook by Cadmus was never paid to that officer, nor was any payment made to him by or in behalf of Cook or Cadmus, or the bank. The money which went into the comptroller's office belonged wholly to the plaintiff. Neither Cook, Cadmus the bank or Crawford had any interest in it. The payment was not in fact made for either of them. Crawford paid the money, as he alone could do that and receive a re-assignment of the bond and mortgage. It may be as the court of appeals decided, that on receiving such re-assignment he alone had technically the sole right to foreclose the mortgage. But, surely, neither the power nor duty of the comptroller could interfere with or prevent the completion of a previous arrangement between

Crawford and the plaintiff, or impair the rights or equities of the plaintiff under such arrangement. Can it be that if a mortgagee, while his mortgage is in the possession of the comptroller, under the act relative to the free banks, agrees with a third person that if he will furnish the requisite funds, the mortgage shall be procured with such funds and the security shall be transferred to him who advances the money, and the money is accordingly advanced and paid to the comptroller and a re-transfer had, the mortgagee cannot effectually assign the securities to the lender, or that if he should then refuse to do so, the lender cannot cause such transfer in a court of equity? It is so palpable, that under such circumstances the assignment could be legally made, or if necessary coerced, that the contrary could never have been supposed, but for a misapprehension of the judgment of the court of appeals in the suit of *Mitchell* agt. *Cook*. In this case, there was precisely such an agreement, and the parties have endeavored to consummate it, and have done all that was necessary for that purpose so far as it relates to them.

As Crawford did not pay his own money he acted in a fiduciary capacity in taking the re-assignment. For whom did he then act? Not for the bank if that was owned at the time by any other person, for the money paid by him was not furnished by such bank; nor for Cook, as his money had not been received by Crawford, and of course was not applied by him for any purpose; nor for Cadmus, who had received such money; but most assuredly for the plaintiff, who had actually furnished the identical means.

If the controlling question in this case had been, which of the parties has the greater equity, it seems to me that the decision must have been in favor of the plaintiff. It is true that Cook has actually paid his money with an intent that it should be credited to him on his bond and mortgage. But he knew that those papers had been transferred to, and as he had every reason to believe, if he did not actually know, were then held by the comptroller as security for the payment of the circulating notes of the bank to the same amount. He must have

Mitchell agt. Cook.

known, for every one is presumed to know the law, that the payment was unauthorized at the time, and that it could not avail him, unless the bank as the payee should return the notes or pay the amount to the comptroller. He must, therefore, have trusted mainly to the responsibility of Cadmus, to whom he paid the money. It would seem from some of the testimony that he did so. Cadmus failed, and the money was never paid to the state officer. On the other hand, the plaintiff advanced the entire amount, and his funds were the sole consideration of the re-transfer. Knowing the law as he did know it, not only presumptively but actually, he was aware that no part of the principal could be legally paid to another while the bond and mortgage were held by the comptroller. He had a right to presume and no doubt did suppose, that no unlawful attempt had been made to pay a part of the principal, and that the whole of it was still due. He was an innocent and *bona fide* purchaser of securities which as they said, and as he had a right to suppose they were, were still valid for the entire amount.

If the payment by Cook had entitled him to a reduction of the principal, the tender of the balance would have been ineffectual, because, first: it was made to one who had no right to receive the money, and secondly, the time of payment of the principal had not arrived. It is very clear that a tender of money before it is payable is invalid. It was contended by the counsel for the defendant, however, that this objection was waived, as it was not mentioned at the time. It is true that an objection is considered as waived when not explicitly stated, when it could have been obviated by the person making the tender if he had been apprised of it; but the principle extends no further. In this case, there was of course, no power to waive or avoid the objection if it had been mentioned.

Upon the whole, it seems to me that the entire principal was due at the time of the assignment to the plaintiff, and that such assignment is valid.

There must be the usual judgment of foreclosure for the entire principal, and the interest upon it from the date of the re-assignment by the comptroller.